## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

-------------------------------------------------------------------X
                                       :

BURGERFI INTERNATIONAL, LLC             :        **COMPLAINT**
                                         :

    Plaintiff,                             :

                                       :      Case No.

vs.                                  :      9:15cv81544
                                       :

SHREE AT PHILLY DOWNTOWN, LLC    :
SHREE AT NEW BRUNSWICK, LLC      :
SHREE AT SECAUCUS, LLC             :
INFINITE MANAGEMENT, LLC         :
INFINITE DEVELOMENT, LLC          :
JAYESH BRAHMBHATT                :
MAYANK AMIN                     :
BIJEN A. PATEL                      :
PARESH N. PATEL                  :
MITESH PATEL                    :
KARTIK PATEL                    :
                                       :

    Defendants.                        :
                                       :
-------------------------------------------------------------------X

The plaintiff BurgerFi International, LLC ("BFI") for its Complaint against the defendants, alleges as follows:

## PRELIMINARY STATEMENT

1.    This action arises out of the defendants' numerous and repeated breaches of their BURGERFI franchise agreements and their fraudulent conduct, as detailed at great length herein. BFI is the franchisor of the BurgerFi franchise system. The defendants, in varying groups, owned and operated BurgerFi

restaurants in Philadelphia, Pennsylvania and New Brunswick, New Jersey. Before losing possession of certain premises in Secaucus, New Jersey following an eviction proceeding by the landlord, certain of the defendants were building out a BurgerFi restaurant at the Harmon Meadow Plaza. Construction was never completed and the restaurant never opened.

2.      The defendants' many breaches of their franchise agreements with BFI have led to BFI's termination of those agreements. BFI brings this action to vindicate its rights, to obtain judicial declarations of the terminations of the agreements, to enforce the post-termination obligations of the franchise agreements, and to recover monetary damages incurred because of the defendants' breaches and fraudulent conduct. In particular, BFI seeks to enforce the requirements that the defendants convey to BFI (i) the lease and the furniture, fixtures, and equipment and the liquor license for the Philadelphia restaurant, in accordance with the provisions of the franchise agreement governing that location in order to permit BFI to continue to operate the BurgerFi restaurant in that location, and (ii) the furniture, fixtures, and equipment and the liquor license for the Secaucus restaurant, in accordance with the provisions of the franchise agreement governing that location. BFI is entitled to preliminary and permanent injunctive relief, damages, declaratory relief, and attorneys' fees.

## JURISDICTION AND VENUE

3.      This is a civil action arising from the contracts between the parties.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

5.      Jurisdiction exists under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

6.       BFI is a limited liability company whose ultimate owners are all citizens of Florida. Its principal place of business is located in North Palm Beach, Florida.

7.      The defendants Shree at Philly Downtown, LLC ("Shree Philly"), Shree at New Brunswick, LLC ("Shree NB"), Shree at Secaucus, LLC ("Shree Secaucus"), Infinite Management, LLC ("IML"), and Infinite Develoment [sic], LLC ("IDL")  are limited liability companies, each of whose ultimate owners are citizens of New Jersey and Delaware.  Each of the LLC defendants has its principal place of business in New Jersey.

8.      The defendant Jayesh Brahmbhatt ("Jayesh") is a citizen of Delaware.

9.      The defendants Bijan A. Patel ("Bijan"), Paresh N. Patel ("Paresh"), Mayank Amin ("Mayank"), Mitesh Patel ("Mitesh"), and Kartik Patel ("Kartik") are all citizens of New Jersey.

3

10. The amount in controversy exceeds $75,000 because the damages claimed by BFI exceed that amount, and because the rights for which BFI seeks declarations of its rights have values in excess of $75,000.

11. Personal jurisdiction exists over the defendants, and venue is proper in this Court. The defendants each agreed in their BurgerFi franchise agreements to submit to jurisdiction and venue in the district in which BFI's principal place of business is located at the time suit is filed. BFI's principal place of business is located in this district. Personal jurisdiction is also proper under the Florida long-arm statute.

## THE BURGERFI SYSTEM

12. BFI is the franchisor of the BurgerFi franchise system and owns (and/or has the legal right to sublicense to its franchisees) the federally registered mark "BurgerFi," and related marks, which is incontestable pursuant to 15 U.S.C. § 1065 (the "BurgerFi Marks"). Through executed franchise agreements, BFI franchisees are permitted to use the BurgerFi Marks and operate BurgerFi restaurants at approved locations. BFI's affiliates and franchisees have operated BurgerFi restaurants since 2011. There are now approximately 75 BurgerFi restaurants operating throughout the country.

13. BurgerFi restaurants specialize in the sale of hand-crafted, all-natural Angus burgers, veggie burgers, hot dogs, fresh cut fries and onion rings, craft

beers, wine and freshly prepared custards.  BurgerFi restaurants are operated in accordance with BFI's detailed standards and specifications. BFI licenses to franchisees the BurgerFi Marks, as well as the trade dress, recipes, methods, and specifications that BFI has developed ("the BurgerFi System").

14.     BurgerFi restaurants and products are distinctive. The recipes, specifications, trade dress, and other aspects of the BurgerFi System are the product of substantial investment by BFI, have developed substantial goodwill, and have immeasurable value to BFI.

15.     The BurgerFi Marks have become synonymous in the minds of consumers with the high quality products and services that are offered at legitimate, licensed BurgerFi restaurants. The BurgerFi Marks have achieved secondary meaning.

## THE FRANCHISE RELATIONSHIP BETWEEN THE PARTIES

16.     In September 2012, the defendants Jayesh, Mayank, Bijen and Paresh formed IML and IDL.

17.     In September and October, 2012, Jayesh, Mayank, Bijen and Paresh submitted Requests for Consideration to BFI to become BurgerFi franchisees. They represented that their total assets exceeded $11.5 million, and their net worth exceeded $6.6 million.

18.     Over the next five weeks, BFI and Jerry Marks, Esq. ("Marks"), counsel for the prospective franchisees, engaged in substantial negotiations of the franchisee documents. These negotiations took place during numerous phone calls, emails and in person meetings. During the course of these negotiations, BFI agreed to many changes to its standard franchise documents requested by Marks on behalf of the franchisees, which are reflected in Addenda to the agreements.

19.     On November 16, 2012, BFI and IML executed a Multi-Unit Operator Agreement and Addendum (the "Multi-State MUOA"), pursuant to which BFI granted IML the right, and IML undertook the obligation, to open six BurgerFi restaurants, in certain portions of Delaware, Philadelphia and Florida. A copy of the Multi-State MUOA and Addendum is Exhibit 1 to the Complaint.

20.     Also, on November 16, 2012, BFI and IML executed a BurgerFi Franchise Agreement governing the operation of a BurgerFi restaurant in Philadelphia, Pennsylvania (the "Philadelphia Franchise Agreement"). A copy of the Philadelphia Franchise Agreement is Exhibit 2 to the Complaint.

21.     Both the Multi-State MUOA and the Philadelphia Franchise Agreement were executed by Jayesh, Mayank, Bijen and Paresh as Managing Members of IML. Each of those individuals also executed a personal guarantee of IML's obligations under both agreements, as well as confidentiality and non-compete agreements.

22.     Also, on November 16, 2012, BFI and IDL executed a Multi-Unit-Operator Agreement and Addendum (the "New Jersey MUOA") pursuant to which BFI granted IDL the right, and IDL undertook the obligation, to open two BurgerFi restaurants in New Jersey.  A copy of the New Jersey MUOA and Addendum is Exhibit 3 to the Complaint.

23.     Also, on November 16, 2012, BFI and IDL executed a Franchise Agreement governing the operation of a BurgerFi restaurant in New Brunswick, New Jersey (the "New Brunswick Franchise Agreement").  A copy of the New Brunswick Franchise Agreement is Exhibit 4to the Complaint.

24.     Both the New Jersey MUOA and the New Brunswick Franchise Agreement were executed by Jayesh, Mayank, Bijen and Paresh as Managing Members of IDL. Each of those individuals executed personal guarantees of IDL's obligations under the New Jersey MUOA and the New Brunswick Franchise Agreement, as well as confidentiality and non-compete agreements.

25.     Pursuant to the Philadelphia Franchise Agreement and the New Brunswick Franchise Agreement, the respective BurgerFi restaurants were to have been open for business on or before August 16, 2013.  Neither restaurant was open for business as of August 16, 2013.

26.     On August 21, 2013, Mitesh and Kartik submitted a Request for Consideration to join the ownership groups of IML and IDL.

27.     On September 30, 2013, the Philadelphia Franchise Agreement was assigned by IML to Shree Philly. The members of Shree Philly were Jayesh (30%), Bijen (30%), Paresh (30%), Mitesh (5%) and Kartik (5%). Mitesh and Kartik executed personal guarantees, and non-compete and confidentiality agreements. Jayesh, Bijen, Mayank, and Paresh agreed to remain personally liable under the Philadelphia Franchise Agreement.

28.     Also on September 30, 2013, the New Brunswick Franchise Agreement was assigned by IDL to Shree NB. The members of Shree NB were Jayesh (30%), Bijen (30%), Paresh (30%), Mitesh (5%), and Kartik (5%). Mitesh and Kartik executed personal guarantees, and non-compete and confidentiality agreements.  Jayesh, Bijen, Mayank, and Paresh agreed to remain personally liable under the New Brunswick Franchise Agreement.

29.     On October 1, 2013, BFI, IML, IDL, Jayesh, Mayank, Bijen, Paresh, Mitesh and Kartik executed two Consent to Transfer of Interest Agreements, one each for the Philadelphia and New Brunswick restaurants, to incorporate Mitesh and Kartik into the ownership group of Shree Philly and Shree NB. Pursuant to the Consent to Transfer of Interest Agreements, Shree Philly, Jayesh, Bijen, Paresh, Mitesh and Kartik undertook all obligations under the Multi-State MUOA and Philadelphia Franchise Agreement; Shree NB, Jayesh, Bijen, Paresh, Mitesh and Kartik undertook all obligations under the New Jersey MUOA and New Brunswick

Franchise Agreement; and all those parties executed a full release of any and all claims against BFI.

30.    On November 19, 2013, Shree Secaucus executed a Franchise Agreement (the "Secaucus Franchise Agreement") governing the operation of a BurgerFi restaurant in Secaucus, New Jersey. Jayesh, Bijen, Paresh, Mitesh and Kartik executed the Secaucus Franchise Agreement as Managing Members. Each of those individuals executed personal guarantees of Shree Secaucus's obligations under the Secaucus Franchise Agreement, as well as confidentiality and non-compete agreements. A copy of the Secaucus Franchise Agreement is Exhibit 5 to the Complaint.

## THE DEFENDANTS' FAILURES TO OPEN THE RESTAURANTS IN A TIMELY FASHION

31.    On December 3, 2013, Mayank requested an extension to open defendants' BurgerFi restaurants. Mayank represented that the defendants would open the Philadelphia and New Brunswick restaurants by the end of the year and the Secaucus restaurant by the Super Bowl (February 2, 2014). Pursuant to the respective Franchise Agreements, the Philadelphia and New Brunswick restaurants were to open by August 16, 2013, and the Secaucus restaurant by April 16, 2014.

32.    Neither the Philadelphia restaurant nor the New Brunswick restaurant was open by the end of 2013.

33.     In early 2014, in accordance with section 6.4.2 of the Philadelphia Franchise Agreement, BFI provided training in advance of the opening of the Philadelphia Restaurant at Shree Philly's expense. On February 11, 2014, the Philadelphia restaurant opened.

34.     On February 19, 2014, BFI sent Shree Philly an invoice in the amount of $10,647.93 for the training expenses. Shree Philly has never paid the open invoice.

35.     In February 2014, in accordance with section 6.4.2 of the New Brunswick Franchise Agreement, BFI provided training in advance of the opening of the New Brunswick restaurant at Shree NB's expense.

36.     On or about March 11, 2014, the New Brunswick restaurant opened for business.  On June 7, 2014, BFI sent Shree NB an invoice in the amount of $9,000.00 for the training expenses. Shree NB has never paid the open invoice.

37.     As of the Super Bowl on February 2014, the Secaucus restaurant had not opened. Indeed, the Secaucus restaurant has never opened and the defendants were dispossessed for failure to pay rent, as set forth below.

38.     On May 30, 2014 Jayesh met with representatives of BFI indicating that, despite the representation that the defendants had at least a $6.6 million net worth, his group was out of money and requested a significant loan.

## THE DEFENDANTS' REPEATED OPERATIONAL AND <u>MONETARY DEFAULTS</u>

39.     On June 10, 2014, the landlord of the Secaucus location sent a Default Notice to Shree Secaucus for non-payment of rent.

40.     On June 26, 2014, Josh Lorence, then the Chief Operating Officer of BFI, sent an email to Shree Philly setting forth the subpar conditions at the Philadelphia restaurant, based on the receipt of a number of customer complaints, restaurant audits and coaching visit reports.

41.     On July 10, 2014 the Secaucus landlord sent another Default Notice to Shree Secaucus for non-payment of rent.

42.      Sections 4.2 and 4.3 of each of the New Brunswick Franchise Agreement and Philadelphia Franchise Agreement required the franchisee to pay to BFI a weekly Royalty Fee and a weekly Brand Fund Fee in the amounts of 5.5% and 1% of gross sales, respectively. The payments are to be made by direct withdrawal from the franchisee's bank account.

43.     On September 5, 2014, BFI received notice from Shree Philadelphia's bank that there were insufficient funds to cover the weekly Royalty Fee and weekly Brand Fee. Shree Philly covered the failed direct withdrawal on September 18, 2014.

44.     On September 8, 2014, the landlord of the Philadelphia restaurant sent a Default Notice advising Shree Philly that its rent check had bounced. Shree Philly made the rent payment on September 10, 2014.

45.      On September 9, 2014, Jayesh, Mayank, and Bijen informed BFI that they owed rent in Philadelphia, and that they did not have the funds to complete the Secaucus construction, or begin the construction of an additional restaurant to be located near Temple University in Philadelphia, Pennsylvania.

46.     Nonetheless, on September 10, 2014, Shree Philly executed a lease for the Temple University location, the second location under the Philly MUOA.

47.     Also, on September 10, 2014, the landlord of the Secaucus location sent another Default Notice to Shree Secaucus for non-payment of rent.

48.     On September 15, 2014, BFI received notification from the defendants' banks that there were insufficient funds to cover the weekly Royalty Fee for Philadelphia and Brand Fee for New Brunswick.

49.     On September 17, 2014, BFI received notice from Sysco Foods ("Sysco"), the distributor for most of the products required to be offered at BurgerFi restaurants, that the Philadelphia restaurant was not current on its obligations in the amount of over $15,000.

50.     On September 22, 2014, Mayank informed BFI by email that the defendants had executed loan documentation in connection with a loan taken out

for the construction of the Secaucus restaurant. Section 14.2.3 of the Secaucus Franchise Agreement requires the franchisee to obtain BFI's approval in advance before transferring or granting a security interest in any of assets of the restaurant. The September 22, 2014 email was the first notice BFI had received of this loan.

51.     On October 3, 2014, Sysco placed the Philadelphia restaurant on COD.

52.     On October 10, 2014, the landlord of the Secaucus location sent another Default Letter to Shree Secaucus for non-payment of rent.

53.     On October 14, 2014, Sysco refused to ship any additional products to the Philadelphia restaurant until the account was brought current.

54.     On October 17, 2014, Louis Torelli, a BFI employee, met with Jayesh and Mayank regarding the poor scores they received on operational assessments of the Philadelphia and New Brunswick restaurants, including a 45% score at Philadelphia; an assessment score under 90% is considered unacceptable.

55.     On or about October 22, 2014, Shree Philly delivered a payment check to Sysco, but the check bounced.

56.     On October 24, 2014, the landlord at the Philadelphia restaurant sent a Default Letter to Shree Philly for non-payment of rent.

57.     On October 28, 2014, Shree Philly promised Sysco that it would wire the past due funds. No payments were ever made.

58.     By letter dated October 29, 2014, Sysco demanded payment for the past-due amounts at the Philadelphia restaurant. Sysco ceased shipping products at the Philadelphia Restaurant on or about that date.

59.     On October 31, 2014, the landlord of the New Brunswick restaurant sent Shree NB a default notice.

60.     On November 4, 2014, Mayank sent BFI proof of payment to Sysco and to the Philly and Secaucus landlords.

61.     Despite this "proof", on November 7, 2014, Sysco stated that it could not deliver the next order until it received payment. On November 10, 2014, the landlord at the Secaucus location sent a demand letter for non-payment of rent to Shree Secaucus; and on November 12, 2014, the landlord of the New Brunswick location sent a demand letter for non-payment of rent of more than $45,000.

62.     On November 18, 2014, BFI sent Shree Philly an email outlining the poor conditions and operations at the Philadelphia restaurant, and relaying customer complaints.

63.     On December 10, 2014, the landlord of the Secaucus location sent a default notice to Shree Secaucus for non-payment of rent.

64.     On December 11, 2014, the landlord of the Philadelphia location sent a default notice to Shree Philly for non-payment of rent.

65.    On December 19, 2014, the landlord of the Secaucus location sent a notice to Shree Secaucus that the lease would terminate in five days because the default had not been cured. On December 24, 2014, Mayank delivered a check to the Secaucus landlord to cure the default.

66.    In late December 2014, Louis Torelli visited the Philadelphia restaurant, and found the conditions to be deplorable.

67.    On January 12, 2015, the landlord at the Secaucus location sent Shree Secaucus a default letter for non-payment of rent.

68.    In January 2015, BFI received reports from employees of the Philadelphia restaurant that payroll checks had bounced. In addition, Jayesh informed BFI that Shree Philly was unable to fix a water leak and rectify a fruit fly problem in the Philadelphia restaurant because there was no money.

69.    On January 30, 2015, Shree Philly's bank advised BFI that there were insufficient funds in the bank account to pay the Brand and Royalty Fees.

## THE INITIAL NOTICES OF DEFAULT

70.    Section 17.2 of each Franchise Agreement permits the Franchisor to send notices of default to the Franchisee and affords the Franchisee a cure period, the length of which varies depending on the default. Section 17.2 also authorizes Franchisor to terminate the Franchise Agreement if the default is not cured.

Section 17.1 authorizes the Franchisor to terminate the Franchise Agreement without opportunity to cure under certain circumstances.

71.     On February 10, 2015, BFI issued a formal Notice of Default to Shree Philly and Shree Secaucus. The notice to Shree Philly identified numerous operational defaults. The notice to Shree Secaucus identified the failure to open the restaurant by April 16, 2014, as required by the Secaucus Franchise Agreement. The notices afforded the franchisees under the respective Franchise Agreements the opportunity to cure the defaults.

## THE CONTINUING BREACHES

72.     On February 17, 2015, the Pennsylvania Liquor Control Board issued a notice of violation to Shree Philly regarding a bounced check.

73.     Also on February 17, 2015, the landlord of the Secaucus location issued another default notice to Shree Secaucus stating that that the lease would terminate in five days due to the failure to cure the monetary defaults noticed on January 12, 2015. The next day, the landlord at the Secaucus location filed a Complaint against Shree Secaucus for non-payment of rent, claiming about $27,000 in past-due rents.

74.     On February 24, 2015, Mayank sent BFI an email requesting additional time to open the Secaucus restaurant. He advised BFI that a bank loan had closed, but had been delayed because Mitesh and Kartik had sold their

membership interest in Shree Secaucus. Shree Secaucus had never sought BFI's approval of the loan, as required by the section 14.2.3 of the Franchise Agreement. Furthermore, BFI never approved the withdrawal of Mitesh and Kartik. Sections 14.2.2 and 14.4.1 of the Secaucus Franchise Agreement require BFI's approval for changes in ownership, and affords BFI a right of first refusal for any change of ownership. Shree Secaucus did not comply with the relevant provisions of the Secaucus Franchise Agreement in connection with this transaction.

75.    On February 26, 2015, Sysco advised BFI that it would not deliver product to the Philadelphia restaurant without getting paid and that the franchisee was not responding to Sysco. The next day BFI advised Sysco that it would guarantee payment to Sysco so that product would be delivered to the Philadelphia restaurant.

76.    On February 27, 2015, the landlord at the Philadelphia location sent a default to Shree Philly for failure to pay rent and to provide certain required documentation under the lease.

77.    On March 2, 2015, BFI received notification from Shree Philly's bank that its account had insufficient funds to cover the Royalty and Brand fees for the prior two weeks.

## THE DEFENDANTS' PROPOSAL TO HAVE BFI MANAGE THE PHILADELPHIA RESTAURANT

78.    Also on March 2, 2015, Mayank, Bijen, and Jayesh met with BFI. They asked BFI to take over the management of the Philadelphia restaurant. BFI agreed to do so. On the same day, BFI sent a Management Agreement to Shree Philly.

79.    On March 8, 2015, BFI received a report that the Philadelphia restaurant was out of many items and was filthy. The next day, on March 9, 2015, BFI sent another Notice of Default for the Philadelphia restaurant. The notice set forth numerous operational defaults, as well as monetary defaults. Since Shree Philly had previously received a default notice and thirty days to cure the operational defaults, no additional cure period was required. With respect to the monetary defaults, Shree Philly was provided a five-day cure period in accordance with the Philadelphia Franchise Agreement. The day after that, on March 10, 2015, BFI received a notice of insufficient funds to cover the weekly Brand and Royalty fees for the Philadelphia and New Brunswick restaurants.

80.    Meanwhile, on March 8, 2015, the landlord at the Secaucus location posted an eviction notice on the door of the Secaucus location.

81.    On Friday, March 13, 2015, BFI finally received comments to its draft Management Agreement. BFI made some of the changes requested by Shree Philly and sent a new draft to Marks, Shree Philly's attorney. Shree Philly

promised to review the agreement over the weekend, sign it on Monday, and wire the funds for the outstanding fees.

82.     On March 16, 2015, the Monday after returning the draft Philly Management Agreement to Shree Philly's attorney, BFI advised Shree Philly that it had not received either the promised payment or a signed Management Agreement.

83.     On March 18, 2015, BFI again advised Shree Philly that no payments and no signed Management Agreement had been received. Shree Philly informed BFI for the first time that it had signed a Future Receivables Agreement, pursuant to which all of the revenues of the Philadelphia restaurant were deposited into a third party's account. BFI requested the paperwork in order to understand the details of the arrangement. Marks, Shree Philly's attorney, sent BFI documentation, but it was is in part unreadable and incomplete.

84.     On March 20, 2015, Sysco informed BFI that it had not received payment and would only make a minimum delivery. BFI learned that the Philadelphia restaurant was virtually out of most of the menu items, and that it was serving frozen meat and other items that did not comply with BFI's specifications and violated BurgerFi brand standards. Two days later, BFI received reports that the Philadelphia restaurant had to close during the day because it ran out of meat.

85.    On March 30, 2015, Marks advised BFI that Shree Philly could not sign the Management Agreement due to the Future Receivables Agreement Shree Philly had entered into (without authorization from BFI). BFI could not effectively operate a restaurant without access to the restaurant's revenues.

86.    On April 3, 2015, an article authored by Adam Erace was posted on the Courier Post online detailing the deplorable conditions of the Philadelphia restaurant, which was highly detrimental to the BurgerFi brand. Erace wrote, among other things:  "[t]he trashcan was overflowing. Discarded straws and spent spoons sticky with soft-serve surrounded the can, a halo of garbage. A red splooge of ketchup stained the tile…Who I really blame for the sorry condition [of] this restaurant is the management. That work ethic needs to come from the top… Almost worse than the condition of this otherwise good-looking spot was how many things they were out of. Here is a list: onion rings, Kobe beef hot dogs, red velvet cake and mango and coconut. They were also out of napkins. Empty caddy after empty caddy sat on each table."

87.    Section 19.24 of the Philadelphia Franchise Agreement authorizes BFI to take over the management of the restaurant under certain circumstances. It provides:

> If we determine in our sole judgment that the operation
> of your business is in jeopardy, or if a default occurs and
> remains uncured after written notice and opportunity to
> cure in accordance with the terms of this Agreement,

then in order to prevent an interruption of the Franchised Business which would cause harm to the System and thereby lessen its value, you authorize us to operate your business for a long as we deem necessary and practical…..

We shall keep in a separate account all monies generated by the operation of your business, less the expenses of the business, including reasonable compensation and expenses for our representatives. In the event of our exercise of the Step-In Rights, you agree to hold harmless us and our representatives for all actions occurring during the course of such temporary operation. You agree to pay all of our reasonable attorneys' fees and costs incurred as a consequence of our exercise of the Step-In Rights.

88.   Shree Philly asked BFI to manage the Philadelphia restaurant. Because the proper operation of the Philadelphia restaurant was in jeopardy, and there were outstanding uncured defaults, BFI agreed, and on April 4, 2015, sent Shree Philly notice that it was exercising its "step-in rights" in Philadelphia under the Philadelphia Franchise Agreement. Marks advised BFI that this action was absolutely necessary.

89.   Thus, on April 5, 2015, BFI took over the actual operation of the Philadelphia restaurant. BFI opened its own accounts, as provided by Section 19.24. BFI found that the condition of the restaurant was shockingly bad and decided to temporarily close it. BFI discovered that there were not enough products

to operate, not enough labor to serve customers, there were safety issues, and the store was filthy.

90.    BFI also discovered that someone had pulled all of the licenses off the wall and emptied the safe at the Philadelphia restaurant. When BFI advised Marks of this development, he promised to get the licenses back.

91.    On April 8, 2015, BFI received an email from Kartik and Mitesh asking BFI to update them on the Philadelphia situation because their partners were not providing them with any information and that they were forced out of the business.

## SHREE PHILLY'S FIRST PROPOSAL TO SELL TO AN UNACCEPTABLE BUYER

92.    In late April 2015, Shree Philly proposed selling the Philadelphia restaurant to an individual named Jay Pandya. BFI provided a preliminary approval of Mr. Pandya to enable Shree Philly to pursue a possible sale of the Philadelphia restaurant, conditioned upon satisfaction of the criteria in the Franchise Agreement for a transfer of ownership of the franchise.

93.    Pandya, however, identified himself as a franchisee of a competing hamburger chain. One of the conditions that BFI insisted on was proof that a transfer would not violate any existing non-compete agreements, a condition that would be required of any prospective BurgerFi franchisee.

94.    Pandya never satisfied that requirement and there were no serious further discussions about a potential acquisition by Mr. Panda.

95.    In the meantime, on May 8, 2015, the landlord of the Philadelphia restaurant sent Shree Philly a default letter seeking over $40,000 in unpaid rent.

## THE CONTINUING DEFAULTS AND THE CLOSING OF THE NEW BRUNSWICK RESTAURANT

96.    On May 26, 2015, BFI was notified by several Shree NB employees that the New Brunswick restaurant had closed. The employees called to ask BFI what had happened and about the status of their paychecks. On the same day, BFI received a letter from Roma Funding, LLC regarding a default by Shree Secaucus on a promissory note executed January 8, 2015 for approximately $50,000. Section 14.2.3 of the Secaucus Franchise Agreement requires the franchisee to obtain BFI's approval in advance before transferring or granting a security interest in any of assets of the restaurant.  The notice received on May 26, 2015 is the first BFI had been advised of this promissory note.

97.    On June 4, 2015, the Pennsylvania Liquor Control Board issued a citation and set a hearing date of July 21, 2015 for Shree Philly to show cause why its liquor license should not be revoked.

98.    In June 2015, an existing BurgerFi franchisee offered the defendants $2 million for all three restaurants.  Marks told BFI that his clients wanted $2.5 million and wanted BFI to "make up the difference."

23

99.    On July 10, 2015, the landlord for the New Brunswick restaurant issued a termination notice for the lease of the premises, and demanded that Shree NB vacate by July 31.

100.    On July 17, 2015, BFI issued a Notice of Default for New Brunswick and Secaucus. The New Brunswick notice referenced the landlord's termination notice. The Secaucus notice referenced the failure to open the restaurant as required by the Secaucus Franchise Agreement and the Multi-State MUOA.

101.    On July 27, 2015, the landlord for the Secaucus location issued another default notice to Shree Secaucus regarding non-payment of rent. On July 30, 2014, the same landlord issued another default notice regarding the failure to have required insurance.

102.    On July 28, 2015, BFI sent emails to the defendants and Marks regarding the defendants' failure to respond to the July 17, 2015 default notice. There was no response to the specific emails.

103.    On July 30, 2015, Shree NB informed BFI that it had reached a settlement with the New Brunswick landlord, pursuant to which the landlord would withdraw the eviction action. This turned out to be false, and Shree NB never made the payment it had promised to make.

104.   On August 5, 2015, BFI again asked the defendants and Marks for an update on the Secaucus and New Brunswick default letters. BFI did not receive a response.

105.   On August 15, 2015, BFI determined that in order to sell alcoholic beverages at the Philadelphia restaurant under Shree Philly's liquor license, it needed to enter into a Management Agreement with Shree Philly. Accordingly BFI sent a revised Management Agreement to Shree Philly's liquor license counsel.

106.   On August 18, 2015, BFI learned that Shree NB had not ordered product from Sysco in over a month, was out of many items, and was serving many items, including the BurgerFi signature burgers, that were not in accordance with BFI's specifications. Accordingly, on August 20, 2015 BFI sent a notice of default to Shree NB. On information and belief, the New Brunswick restaurant closed for several days on or about June 14, 2015.  Shree NB never informed BFI of the closing of the restaurant.

107.   On August 20, 2015, BFI had a telephone conference with Mayank and Marks. They advised BFI that the defendants had found a purchaser for the Philadelphia restaurant who had offered $1.1 million, but that his client wanted $1.2 million. Marks also said that the proposed purchaser had no restaurant experience, and that he wanted BFI to "make up the difference" in the price. Marks

also said that if BFI would "fund Secaucus" his client would sign the Philadelphia Management Agreement.

108.   Also on August 20, 2015, the Pennsylvania Department of Revenue issue a notice revoking the Sales Use and Hotel Occupancy Tax license for the Philadelphia restaurant for failure to pay sales and use taxes.

109.   On August 24, 2015, the Secaucus landlord informed BFI that it intended to "recapture the space."  The landlord filed suit against Shree Secaucus, and named BFI as a defendant for purposes of its assignment and assumption rights under the lease.

110.   On August 27, 2015, the Pennsylvania Liquor Control Board issued a citation against Shree Philly.

111.   On August 29, 2015, Jayesh appeared at the Philadelphia restaurant around 1:30 a.m. Employees at the restaurant reported that he appeared to be intoxicated and told them he could fire them all. Jay pointed his fingers at employees as if his index finger was the barrel of a gun and his thumb in the upward position like a trigger.

112.   On September 1, 2015, BFI learned that a default judgment had been issued against Shree Philly in a lawsuit brought by a check cashing company.

## SHREE PHILLY'S SECOND PROPOSAL TO SELL TO
## AN UNAPPROVED BUYER

113.   On September 8, 2015, Mayank informed BFI that the defendants would be able to finalize the sale of the Philadelphia restaurant. The defendants, however, had taken no steps to comply with the transfer requirements of the Philadelphia Franchise Agreement. BFI was not even provided with the prospective buyer's information and experience to allow it to make an informed decision. BFI informed Mayank that this information must be provided, as well as the terms of the offer, in order to satisfy the right of first refusal granted to BFI in the Franchise Agreement.

114.   On September 11, 2015, Mayank submitted information about the prospective buyer of the Philadelphia restaurant, Deepak Verma. On September 16, 2015, BFI met with Mr. Verma at its office in North Palm Beach, Florida. Verma informed BFI that it would be premature for him to make an offer as he did not have basic financial information about the restaurant, including the amount of debt, had not yet been permitted to see the kitchen and witness the back of the house operations, and had not been advised of the reasons behind the defaults and step-in by BFI. BFI also expressed concern about Verma's background, which did not include restaurant experience, his refusal to partner with an experienced operator, and his lack of a plan for the operation of the restaurant.  BFI does not approve

27

franchisees with no prior restaurant experience or no operating partner, as operational experience is critical to the successful operation of a restaurant.

115.   On September 18, 2015, BFI sent a detailed letter to Shree Philly regarding the steps that were required before it could approve Verma's purchase. Three days later, on September 21, 2015, BFI received a Letter of Intent ("LOI") between the Franchisees and Verma for the sale of all three restaurants: Philadelphia, New Brunswick, and the unfinished Secaucus restaurant. The LOI did not address any of the transfer conditions set forth in BFI's September 18, 2015 letter. Verma also again informed BFI that any offer from him would be premature since he had not completed his due diligence.

116.   On September 23, 2015, BFI received an email from Mitesh and Kartik. The email stated that they were no longer affiliated with the New Brunswick, Secaucus, or Philadelphia locations because they sold their membership interests; that the reason they separated was due to "the poor operations of the businesses by the controlling members of the entities"; and that because of their minority ownership, they had "no control or say in the operations of the businesses" even though they were the only members "qualified…to properly manage and operate the businesses". BFI at no time approved the sale of Mitesh and Kartik's interests as required by the Franchise Agreements, and at no time released them from their contractual obligations to BFI.

117.   On September 25, 2015 BFI provided a "pre-conditional approval" of Verma, which approved him to go forward with his due diligence but reserved to BFI the right to impose conditions on his purchase. Following a demand by Marks, BFI provided a more detailed "conditional approval," on September 29, 2015.

118.   On October 1, 2015, Shree Philly finally executed the Management Agreement with an affiliate of BFI to manage the Philadelphia restaurant. Shree Philly informed BFI for the first time that Mitesh and Kartik had sold their interest. Bijen and Marks separately asked for a conditional approval of Verma's acquisition, even though BFI had already sent conditional approvals on September 25 and September 29, 2015.

119.   Also, on October 1, 2015, BFI received a voicemail from Verma stating that he was not yet ready to buy the restaurants.

120.   On October 5, 2015, Marks sent a threatening email to BFI stating that BFI will be in a "very nasty suit" which "will be extremely damaging to the brand" if BFI did not send the conditional approval of Varma. BFI had already sent the conditional approval multiple times (September 25, 29 and again on October 2). Marks also demanded that BFI "do what is right - or else" and "do it NOW".

121.   BFI has attempted to contact Marks numerous times by phone and emails, but BFI never heard from him again.

122.   On information and belief, the defendants permanently closed the New Brunswick restaurant on or about September 27, 2015, without informing anyone at BFI, in violation of Section 17.1.3(c) of the New Brunswick Franchise Agreement. Since the restaurant closed, BFI has received numerous phone calls and emails from employees of the restaurant seeking their pay checks.

123.   On October 7, 2015 John Guidera, Esq. (another lawyer purportedly represents the defendants), sent letters to the Secaucus and New Brunswick landlords advising them that BFI had approved Verma to buy the Franchisees' restaurants, and requesting an assignment of the leases to Verma. The statement that BFI had approved the sale to Verma was not true.

## THE TERMINATION OF THE FRANCHISE AGREEMENTS

124.   On October 22, 2015, BFI sent the defendants a Notice of Default, stating that if the defaults at the Philadelphia restaurant were not cured within ten (10) days the Franchise Agreement would terminate. None of the defaults were cured. Accordingly, as of November 2, 2015, the Philadelphia Franchise Agreement terminated.

125.   On October 26, 2015 BFI was served with a lawsuit filed by Itria Ventures, LLC regarding monies owed by Shree Philly from the Future Receivables Sales Agreement entered into in November,2014 (without the

knowledge or consent of BFI, in contravention with the Franchise Agreement). BFI was forced to retain counsel to defend it in that lawsuit.

126.   On November 4, 2015, a judge for the Superior Court of the State of New Jersey, County of Hudson issued an Order granting BFI the right to possession of the Secaucus restaurant. BFI cured the monetary defaults incurred by Shree Secaucus, which is in excess of $74,000. In addition, BFI incurred, and is continuing to incur, attorneys' fees as a result of Shree Secaucus's default on its rent payments and the eviction action brought by the landlord.

127.   On or about November 5, 2015, BFI received a notice that Shree Philly was in arrears on its sales and use taxes in excess of $70,000, and, as a result, the liquor license at the Philadelphia restaurant had been cancelled. Thus, even with an approved management agreement, alcohol cannot be sold from the premises.

128.   On November 9, 2015, BFI sent a notice confirming the termination of the Philadelphia Franchise Agreement, and exercising BFI's option to acquire the lease and certain furniture, fixtures, and equipment of the Philadelphia restaurant.

129.   On November 9, 2015, BFI sent a Notice of Termination of the Secaucus Franchise Agreement for loss of the premises, without opportunity to cure, in accordance with section 17.1.3(c) of the Franchise Agreement.  BFI also

exercised its option to acquire the lease and certain furnishings, fixtures and equipment of the Secaucus restaurant.

130.   On November 9, 2015, BFI sent a Notice of Termination of the New Brunswick Franchise Agreement for the failure to operate the restaurant, without opportunity to cure, in accordance with section 17.1.3(c) of the Franchise Agreement.

## COUNT ONE
### (Declaratory Judgment: Termination of the Philadelphia Franchise Agreement)

131.   BFI realleges each and every other paragraph of this Complaint.

132.   Section 17.1 of the Philadelphia Franchise Agreement authorizes BFI to terminate the Franchise Agreement without an opportunity to cure the default under certain circumstances. Those circumstances include, without limitation, failure to pay money owing to "[BFI], or any of [BFI's] affiliates or vendors" within five (5) days following notice; or "if [Franchisee] or any of the Controlling Principals commit three (3) material events of default under this Agreement, within any twelve (12) month period."

133.   Even though it was not required to provide a cure period, BFI, in its October 22, 2015 Notice, afforded the defendants ten days to cure its outstanding defaults.  As stated in the notice, failure to cure the outstanding defaults in that

time would result in automatic termination of the Philadelphia Franchise Agreement without further notice.

134.   The defaults under the Philadelphia Franchise Agreement include, without limitation:

a.   Failure to pay the Sales Use and Hotel Occupancy Tax for 2014 and the first three months of 2015 in violation of Section 17.1.3(g) of the Franchise Agreement, resulting in the Pennsylvania Department of Revenue revoking the Sales Use and Hotel Occupancy Tax license and the liquor license in violation of Section 17.1.3(r).

b.   Entering into "Future Accounts Receivables Sale Agreements" with Itria Ventures, LLC, which required all of the Restaurant's sales proceeds to be diverted to, and directly deposited into, bank accounts owned by Itria. This action was in breach of Section 14.2.3 of the Philadelphia Franchise Agreement.

c.    Failure to pay BurgerFi training invoices in violation of Section 17.1.3(g) of the Franchise Agreement.

d.   Cross-defaults in violation of Section 17.3 of the Franchise Agreement. The Franchisee's Controlling Principals are also in default of the Franchise Agreements they executed with BFI for BurgerFi restaurants in New Brunswick and Secaucus, including, without limitation, failure to

timely open a store in the case of Secaucus and closing of the restaurant in New Brunswick, and the failures to pay rent, which led to the loss of the premises in both locations.

135.   The ten day period set forth in the October 22, 2015 notice has passed without any cure of any default.

136.   Pursuant to 28 U.S.C. §§ 2201 and 2202, BFI seeks a declaratory judgment that the Philadelphia Franchise Agreement was validly terminated by BFI in accordance with the provisions of that agreement.

## COUNT TWO
### (Breach of Contract - Post-Termination Obligations—Philadelphia Franchise Agreement)

137.   BFI realleges each and every other paragraph of this Complaint.

138.   Section 18 of the Philadelphia Franchise Agreement sets forth the obligations of the franchisees on termination of the Franchise Agreement. These obligations include, without limitation:

a.    Section 18.5 requires the Franchisee and the Controlling Principals to promptly pay all sums due BFI.

b.    Section 18.11 requires the Franchisee to assign the lease of the Philadelphia restaurant to BFI at BFI's request. BFI so requests.

c.    Section 18.12 grants BFI the option to purchase all furnishings, fixtures, and equipment related to the operation of the Philadelphia

34

restaurant at fair market value, less any amounts owed to BFI. BFI hereby exercises its option to purchase certain assets related to the operation of the Philadelphia restaurant, including without limitation assignment of the liquor license for the premises.

d.      Section 18.15 requires the Franchisee to assign all telephone numbers and Yellow Pages listings, as well as any Internet listings, domain names, and the like to BFI.

e.      Section 18.16 requires the Franchisee to pay Liquidated Damages equal to the average value of the royalty fees owed during the 12 months before termination, which is $7,114.09 per month, multiplied by 24. That calculation yields $170,738.16.

f.      Section 18.6 requires the Franchisee to pay all damages, costs, and expenses, including reasonable attorneys' fees, incurred in connection with obtaining any remedy available to BFI for violation of the Philadelphia Franchise Agreement, including without limitation obtaining post-termination injunctive or other relief for the enforcement of the post-termination provisions of the Franchise Agreement.

139. Despite the valid termination of the Philadelphia Franchise Agreement, Shree Philly and the Controlling Principals have failed to comply with

the post-termination requirements contained in the Philadelphia Franchise Agreement.

140.   The conduct set forth herein has caused and continues to cause irreparable harm and damage to BFI and the BurgerFi Marks and System.  BFI is entitled to a preliminary and permanent injunction awarding specific performance of, and compelling the defendants immediately to comply with, the post-termination provisions of the Franchise Agreement.

141.   In addition, BFI has sustained actual damages, costs, and attorneys' fees as a result of the defendants' breach of the contractual post-termination obligations in an amount that has yet to be determined.

## COUNT THREE
### (Declaratory Judgment: Termination of the Secaucus Franchise Agreement)

142.   BFI realleges each and every other paragraph of this Complaint.

139.   Section 17.1 of the Secaucus Franchise Agreement authorizes BFI to terminate the Franchise Agreement without an opportunity to cure the default under.

140.   Under the terms of section 17.1 of the Secaucus Franchise Agreement and the termination notice dated November 9, 2015, the Secaucus Franchise Agreement terminated as of November 10, 2015. Pursuant to 28 U.S.C. §§ 2201 and 2202, BFI seeks a declaratory judgment that the Secaucus Franchise

Agreement was validly terminated by BFI in accordance with the provisions of that agreement

## COUNT FOUR
### (Breach of Contract - Post-Termination Obligations—Secaucus Franchise Agreement)

141.   BFI realleges each and every other paragraph of this Complaint.

142.   Section 18 of the Secaucus Franchise Agreement sets forth the obligations of the franchisee on termination of the Franchise Agreement. These obligations include, without limitation:

a.    Section 18.5 requires the Franchisee and the Controlling Principals to promptly pay all sums due BFI.

b.    Section 18.12 grants BFI the option to purchase all furnishings, fixtures, and equipment related to the operation of the Secaucus Restaurant at fair market value, less any amounts owed to BFI. BFI hereby exercises that option and states that the amount owed to BFI far exceeds the fair market value of the furnishings, fixtures, and equipment.

c.    Section 18.15 requires the Franchisee to assign all telephone numbers and Yellow Pages listings, as well as any Internet listings, domain names, and the like to BFI.

e.    Section 18.16 requires the Franchisee to pay Liquidated Damages equal to the average value of the royalty fees owed during the 12

months before termination multiplied by 24. Because the Secaucus restaurant never opened, in breach of the Secaucus Franchise Agreement, it is impossible to perform that calculation.   The defendants owe BFI lost future royalties for the term of the Secaucus franchise agreement in an amount to be proved at trial, but believed to exceed $500,000.

       f.      Section 18.6 requires the Franchisee to pay all damages, costs, and expenses, including reasonable attorneys' fees, incurred in connection with obtaining any remedy available to BFI for violation of the Secaucus Franchise Agreement, including without limitation obtaining post-termination injunctive or other relief for the enforcement of the post-termination provisions of the Franchise Agreement.

143.   Despite the valid termination of the Secaucus Franchise Agreement, Shree Secaucus and the Controlling Principals have failed to comply with the post-termination requirements contained in the Secaucus Franchise Agreement.

144.   The conduct set forth herein has caused and continues to cause irreparable harm and damage to BFI and the BurgerFi Marks and System. BFI is entitled to a preliminary and permanent injunction awarding specific performance of, and compelling the defendants immediately to comply with, the post-termination provisions of the Franchise Agreement.

145.   In addition, BFI has sustained actual damages, costs, and attorneys' fees as a result of the defendants' breach of the contractual post-termination obligations in an amount that has yet to be determined.

## COUNT FIVE
### (Declaratory Judgment: Termination of the New Brunswick Franchise Agreement)

146.   BFI realleges each and every other paragraph of this Complaint.

147.   Section 17.1 of the New Brunswick Franchise Agreement authorizes BFI to terminate the Franchise Agreement without an opportunity to cure the default under certain circumstances, including without limitation cessation of the operation of the restaurant and loss of the franchised premises.

148.   Under the terms of section 17.1 of the New Brunswick Franchise Agreement and the termination notice dated November 9, 2015, the New Brunswick Franchise Agreement terminated as of November 10, 2015.

149.   Pursuant to 28 U.S.C. §§ 2201 and 2202, BFI seeks a declaratory judgment that the New Brunswick Franchise Agreement was validly terminated by BFI in accordance with the provisions of that agreement.

## COUNT SIX
### (Breach of Contract - Post-Termination Obligations—New Brunswick Franchise Agreement)

150.   BFI realleges each and every other paragraph of this Complaint.

151.   Section 18 of the New Brunswick Franchise Agreement sets forth the obligations of the franchisees on termination of the Franchise Agreement. These obligations include without limitation:

a.   Section 18.5 requires the Franchisee and the Controlling Principals to promptly pay all sums due BFI.

b.   Section 18.15 requires the Franchisee to assign all telephone numbers and Yellow Pages listings, as well as any Internet listings, domain names, and the like to BFI.

c.   Section 18.16 requires the Franchisee to pay Liquidated Damages equal to the average value of the royalty fees owed during the 12 months before termination, which is $2,963.16, multiplied by 24.   That calculation yields $71,115.84.

d.   Section 18.6 requires the Franchisee to pay all damages, costs, and expenses, including a reasonable attorneys' fee, incurred in connection with obtaining any remedy available to BFI for violation of the New Brunswick Franchise Agreement, including without limitation obtaining post-termination injunctive or other relief for the enforcement of the post-termination provisions of the Franchise Agreement.

152.   Despite the valid termination of the New Brunswick Franchise Agreement, Shree NB and the Controlling Principals have failed to comply with

the post-termination requirements contained in the New Brunswick Franchise Agreement.

153.   The conduct set forth herein has caused and continues to cause irreparable harm and damage to BFI and the BurgerFi Marks and System. BFI is entitled to a preliminary and permanent injunction awarding specific performance of, and compelling the defendants immediately to comply with, the post-termination provisions of the Franchise Agreement.

154.   In addition, BFI has sustained actual damages, costs, and attorneys' fees as a result of the defendants' breach of the contractual post-termination in an amount that has yet to be determined.

## COUNT SEVEN
### (Declaratory Judgement-Proposed Buyer)

155.   BFI realleges each and every other paragraph of this Complaint.

156.   BFI did not approve the transfer of the Philadelphia restaurant to Verma because (a) it had not received adequate information with which to assess the proposal, (b) it had not received the terms of the offer sufficient to assess whether to exercise its contractual right of first refusal, (c) Verma had no restaurant operations background and had provided no plan to operate the restaurant, and (d) Verma had indicated that he was not ready to proceed because the franchisees had not provided him with basic information about the restaurant.

157.   Nonetheless, Marks, on behalf of the franchisees, threatened to sue BFI if it did not approve the transfer.

158.   BFI has a real and reasonable apprehension that the franchisees will file suit alleging that BFI's failure to approve the transfer was improper. Pursuant to 28 U.S.C. §§ 2201 and 2202, BFI seeks a declaratory judgment that its failure to approve a transfer of the Philadelphia restaurant was proper and in accordance with the provisions of that Philadelphia Franchise Agreement.

## COUNT EIGHT
### (Fraud)

159.   BFI realleges each and every other paragraph of this Complaint.

160.   Prior to becoming BurgerFi franchisees, each of the defendants submitted to BFI Requests for Consideration and supporting documentation which included their net worth and the value of their assets.  The defendants submitted this data with the intent that BFI rely on it in determining whether to accept their applications to become BurgerFi franchisees.

161.   BFI requires financial information such as this because the financial strength of prospective franchisees is material to BFI's determination whether to accept an applicant to become a BurgerFi franchisee.

162.   The net worth and assets set forth in the Requests for Consideration submitted by the defendants showing collective assets exceeding $11 million and net worth exceeding $6 million were satisfactory to BFI. BFI relied on this

information in making its determination to enter into the MUOA's and Franchise Agreements with the defendants.

163.   The financial information that the defendants submitted to BFI was false, inaccurate, and misleading. The defendants' delays in opening their restaurants, their unauthorized and undisclosed financing arrangements, and their admissions, shortly after the restaurants opened, that they were out of money are indications that their financial conditions were in fact far worse than they represented to BFI.

164.   The defendants knew that the financial information they submitted was false, inaccurate, and misleading. The defendants intended to submit false, inaccurate, and misleading financial information for the purpose of convincing BFI to accept them as BurgerFi franchisees.

165.   BFI has been damaged by the defendants' submission of false financial information. BFI would not have granted these BurgerFi franchises to the defendants if it had known the truth about their financial condition. As a result of the defendants' fraud, BFI has been damaged by all the losses it has incurred, the damage to the BurgerFi brand and the trademarks, and lost opportunities it has foregone, as a result of the defendants' fraudulent inducement of BFI to enter into the MUOA's and the Franchise Agreements with them.

## COUNT NINE
## <u>(Indemnification)</u>

166.   BFI realleges each and every other paragraph of this Complaint.

167.   Section 15.1 of each of the Franchise Agreements requires the franchisee to indemnify BFI for any costs incurred, including without limitation attorneys' fees, incurred by BFI as a result of the franchisees' violations of law or breaches of contract.

168.   Section 13.1 of each of the Franchise Agreements requires the franchisees to pay all taxes when due, and to indemnify BFI for any payments of taxes made on the franchisees' behalf as well as any costs incurred, including without limitation attorneys' fees, incurred by BRI as a result of the franchisees' failure to pay taxes.

169.   BFI has incurred substantial expenses as a result of the defendants' breaches of contract and violations of law, including without limitation failure to pay taxes.  As set forth in greater detail above, BFI has incurred attorneys' fees in connection with eviction proceedings in Secaucus and New Brunswick and in connection with the liquor license proceedings in Philadelphia, has paid vendors on the defendants' behalf, has paid rent on the defendants' behalf, and has paid taxes on the defendants' behalf.

44

170.   BFI is entitled to indemnification of all amounts that it has and will pay on the defendants' behalf.

## COUNT TEN
### (Declaratory Judgment: Termination of the Multi-State MUOA)

171.   BFI realleges each and every other paragraph of this Complaint.

172.   Section 9 of the Multi-State MUOA authorizes BFI to terminate the MUOA without an opportunity to cure the default under certain circumstances, including without limitation cessation of the operation of the restaurant, violation of any law, and default in the performance of any financial obligation under a Franchise Agreement.

173.   Under the terms of section 9 of the Multi-State MUOA and the termination notice dated November 9, 2015, the MUOA terminated as of November 10, 2015.

174.   Pursuant to 28 U.S.C. §§ 2201 and 2202, BFI seeks a declaratory judgment that the Multi-State MUOA was validly terminated by BFI in accordance with the provisions of that agreement.

## COUNT ELEVEN
### (Declaratory Judgment: Termination of the New Jersey MUOA)

175.   BFI realleges each and every other paragraph of this Complaint.

176.   Section 9 of the New Jersey MUOA authorizes BFI to terminate the MUOA without an opportunity to cure the default under certain circumstances, including without limitation cessation of the operation of the restaurant, violation of any law, and default in the performance of any financial obligation under a Franchise Agreement.

177.   Under the terms of section 9 of the New Jersey MUOA and the termination notice dated November 9, 2015, the MUOA terminated as of November 10, 2015.

178.   Pursuant to 28 U.S.C. §§ 2201 and 2202, BFI seeks a declaratory judgment that the New Jersey MUOA was validly terminated by BFI in accordance with the provisions of that agreement.

WHEREFORE, BFI demands entry of judgment in its favor, and against the defendants jointly and severally, awarding the following relief:

1. Declaring the Philadelphia, Secaucus, and New Brunswick Franchise Agreements to be  validly terminated;

2. Declaring the Multi-State and New Jersey MUOA's to be validly terminated;

3. Ordering specific performance of the post-termination obligations contained in the Philadelphia, Secaucus, and New Brunswick Franchise Agreements, and preliminarily and permanently

46

enjoining the defendants, and all those acting in concert with them, including their agents, servants, employees, and attorneys, from continuing to breach the post-termination provisions of the Philadelphia, Secaucus, and New Brunswick Franchise Agreements;

4.  Ordering the defendants to file with the Court and serve on counsel for BFI, within five (5) calendar days after service of any injunction issued herein, a written report setting forth in detail, under oath, the manner and form in which they have complied with such injunction.

5. Awarding BFI compensatory and consequential damages for breach of contract in an amount to be proven at trial, but believed to exceed $ 1 million.

6. Awarding BFI damages for fraud in an amount to be proven at trial.

7. Ordering the defendants to indemnify BFI in the amount of for the amounts already paid on the defendants' behalf, and to indemnify BFI for all amounts that it pays on the defendants' behalf in the future.

8. Awarding BFI punitive damages in amount sufficient to deter future fraudulent conduct, in an amount to be determined by the court.

9. Declaring that BFI's failure to approve the transfer of the Philadelphia restaurant to Verma to have been proper.

10. Awarding BFI its costs in prosecuting these claims, including its reasonable attorneys' fees incurred in accordance with the provisions of the Agreements between the parties, and awarding BFI such other and further relief as the Court may deem appropriate.

Respectfully submitted,

/s/ Cory B. Kravit

Cory B. Kravit
Florida Bar No. 0021051
Kravit Law, P.A.
1801 N. Military Trail, Suite 120
Boca Raton, FL 33431
Phone: (561) 922-8536
Fax: (561) 405-3155
Email: corykravit@kravitlaw.net

and

James C. Rubinger
(pro hac vice application to be filed)
Plave Koch, PLC
12005 Sunrise Valley Drive, Suite 200
Reston, VA   20191
Phone:  (703) 774-1208
Fax:  (703) 774-1201
Email:  jrubinger@plavekoch.com

Dated:  November 10, 2015